UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JAMIE BOWENS,

    Plaintiff,

  v.            Case No. 17-C-1124

BELINDA SCHRUBBE et al.,

    Defendants.

## DECISION AND ORDER

  Plaintiff Jamie Bowens, a prison inmate serving a state prison sentence, brought this civil rights action pursuant to 42 U.S.C. § 1983 on Eighth Amendment claims for cruel and unusual punishment, as well as state law claims for negligence and medical malpractice. Bowens alleges that Defendants were deliberately indifferent to his serious medical needs after he tore his Achilles tendon while incarcerated at Waupun Correctional Institution. For the reasons that follow, Defendants' motion for summary judgment will be granted.

## BACKGROUND

  At the time of his injury, Bowens was incarcerated at Waupun Correctional Institution (Waupun). Def.'s Proposed Findings of Fact (DPFF), ¶ 1, Dkt. No. 38. At all times relevant to this case, Defendants were employed at Waupun: Kristine DeYoung and Crystal Messerole as nurse clinicians; Belinda Schrubbe as Health Services Manager; and Dr. Jeffrey Manlove as a physician. *Id.* at ¶ 2.

  On September 26, 2013, Bowens was working as a tier tender when he fell after missing a step on the stairs. *Id*. at ¶¶ 4–5. Bowens believes the fall tore his Achilles tendon; he heard his

right leg "pop" as he fell. Pl.'s Proposed Findings of Fact (PPFF), ¶ 1, Dkt. No. 54. A prison official brought Bowens to Waupun's Health Services Unit (HSU) in a wheelchair after his fall. *Id.* at ¶¶ 2–3.

Between 30 to 60 minutes after his injury, Nurse DeYoung performed a physical exam on Bowens in the HSU. DPFF, ¶¶ 4, 6–7. Nurse DeYoung observed Bowens' right ankle pain, tenderness to palpation in his right Achilles, "throbbing pain" that felt like a "10/10," and a limited range of motion. PPFF, ¶ 4. She noted that Bowens could bear weight when walking only on his heel area. DPFF, ¶ 8. According to Bowens, he was unable to put any weight on his injured foot and Nurse DeYoung assumed that he had torn his Achilles tendon. PPFF, ¶¶ 5, 19. At this time, Nurse DeYoung rendered a nursing assessment: Bowens sustained an "alteration" in both mobility and comfort "related to his ankle/foot injury." DPFF, ¶ 9. She prescribed Tylenol and Ibuprofen, told Bowens to rest, ice, compress, and elevate his injury, and provided him with an Ace bandage wrap and crutches. *Id.* at ¶¶ 11–13. Nurse DeYoung put Bowens on a no-work restriction and scheduled him for a nursing follow-up appointment four days later on September 30, 2013. *Id.* at ¶¶ 17–18. By that time, Nurse DeYoung felt Bowens' swelling would decrease and his injury could be further evaluated. *Id.* at ¶¶ 19–20. She also advised Bowens that he could submit a health request form if there was no improvement in his condition. *Id.* at ¶ 18.

Bowens was seen by Nurse Messerole and Dr. Manlove on September 30, 2013. Bowens arrived at the scheduled follow-up appointment with crutches and was non-weightbearing. *Id.* at ¶¶ 25–26. Nurse Messerole observed swelling and edema where Bowens was injured and also noted he had range of motion limitations, could not bear weight, and had no dorsi or plantar flexion. *Id.* at ¶ 29. Based on her observations, she requested a physician consult for Bowens. *Id.* at ¶ 30.

According to the medical records, Dr. Manlove saw Bowens no more than thirty minutes after Bowens arrived for his appointment at HSU on September 30, 2013. *Id*. at ¶ 32. Although Dr. Manlove did not feel a definite palpable defect in Bowens' tendon, he did observe some swelling and tenderness near the right Achilles and performed a Thompson's test, which was positive. *Id*. at ¶¶ 33–34. As a result, Dr. Manlove believed Bowens likely tore his Achilles tendon; he ordered an MRI for confirmation. *Id*. at ¶ 35.

On October 2, 2013, Bowens underwent an MRI at Agnesian Healthcare that showed the musculotendinous junction of his Achilles tendon had a "very severe partial tear." PPFF, ¶ 39. Typically, MRI results are sent to HSU from the offsite provider one to two days after the MRI is performed; they are then sorted by a nurse and placed in Dr. Manlove's inbox for his review. DPFF, ¶¶ 40–41. If there is an intervening weekend, three to five days might pass after MRI results are delivered to HSU before Dr. Manlove would review them. *Id*. at ¶ 41. Dr. Manlove reviewed Bowens' MRI results before requesting authorization for Bowens to see an orthopedic specialist on October 8, 2013; however, he does not know the specific date of his review. *Id*. at ¶ 42. The relevant committee approved Dr. Manlove's request for an orthopedic specialist on October 9, 2013. *Id*. at ¶ 43. According to Bowens, Dr. Manlove reviewed his MRI on October 10, 2013 (after Bowens requested information about the results on October 7), and provided Bowens a mayoclinic.com handout about Achilles tendon tears to Bowens at that time. PPFF, ¶¶ 41, 43.

Bowens was seen on October 22, 2013, by Margaret Anderson, an advance practice nurse prescriber (APNP) who worked under the supervision of Dr. Thomas Grossman, the orthopedic specialist at Agnesian Healthcare to whom Bowens was referred. *Id*. at ¶ 54. APNP Anderson noted a severe partial tear of Bowens' Achilles tendon and recommended an orthopedic boot at this visit. *Id*. at ¶¶ 55–56. Bowens believes this is the first time his foot and ankle were

3

immobilized; Defendants contend that an Ace bandage provides some immobilization. *Id*. at ¶ 58; Dkt. No. 61 at 14. APNP Anderson did not believe that surgery was viable at this point as Bowens' Achilles was only partially torn and Bowens could walk on his leg. DPFF, ¶ 50. APNP Anderson suggested a follow-up appointment with Dr. Grossman, an orthopedic surgeon, in two to three weeks to see if surgery was necessary. *Id*. at ¶ 52.

Bowens accused HSU of forgetting to schedule an appointment with an orthopedic doctor and requested a second opinion on his torn Achilles tendon in a letter to Schrubbe on October 29, 2013. PPFF, ¶¶ 45–46. The parties dispute whether Dr. Manlove failed to refer Bowens to an orthopedic specialist (Dr. Manlove claims he did so "almost immediately" upon seeing the MRI results) and whether HSU actually forgot to schedule his appointment with an orthopedic doctor. PPFF, ¶ 44–45; Dkt. No. 61 at 11. Schrubbe denied Bowens' request for a second opinion on November 5, 2013. DPFF, ¶ 68.

Bowens saw Dr. Grossman, who is named by Bowens as a medical expert and is not a defendant in this action, on November 7, 2013. *Id.* at ¶ 54. Dr. Grossman recommended that Bowens continue treating his Achilles tendon tear by wearing the orthopedic boot. *Id*. at ¶ 55. Because Bowens did not indicate pain and it appeared his Achilles tendon tear was healing, Dr. Grossman did not recommend surgery. *Id*. at ¶¶ 56–58. However, Dr. Grossman explained that an Ace bandage just provides compression; not immobilization. PPFF, ¶ 69.

Bowens started physical therapy on December 26, 2013. *Id.* at ¶ 49. After physical therapy on February 6, 2014, Bowens felt his right foot was weaker. *Id*. at ¶ 50. Subsequently, Bowens was prescribed an ankle and foot orthotic brace. *Id*. at ¶ 51. In 2017, Bowens claims that it was determined physical therapy was no longer effective at improving his condition. He continues to experience atrophy of the right calf, antalgic gait, and persistent pain. *Id*. at ¶ 53.

4

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party has the burden of showing that there are no facts to support the nonmoving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotation marks omitted).

## ANALYSIS

Bowens asserts a number of Eighth Amendment and state law claims against Defendants. The Eighth Amendment prohibits "cruel and unusual punishments." U.S. Const. amend. VIII. *Estelle v. Gamble* held that prison officials violate the Eighth Amendment when they are deliberately indifferent to a prisoner's serious medical needs. 429 U.S. 97, 104–05 (1976). This does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment is a violation of the Eighth Amendment. Proving deliberate indifference requires showing "(1) an objectively serious medical condition; and (2) an official's deliberate indifference to that condition." *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012).

The parties do not dispute that a tear to the Achilles tendon can be a serious medical condition. The issue here is whether the treatment or lack of treatment Defendants provided amounts to deliberate indifference. Medical malpractice does not establish deliberate indifference. *See Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). Nor does a disagreement over the proper course of treatment or level of medication. *See Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006) ("[W]e have held that a difference of opinion among physicians on how an inmate should be treated cannot support a finding of deliberate indifference."). To violate the Eighth Amendment, a "medical professional's treatment decision must be 'such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment.'" *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016), as amended (Aug. 25, 2016) (quoting *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261–62 (7th Cir. 1996)). The Seventh Circuit has "emphasized the deference owed to the professional judgment of medical personnel." *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016) (citing *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013)). "By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment." *Id*.

Bowens must also show that Defendants actually knew of and disregarded the risk their actions posed to Bowens. "It is not enough that a reasonable prison official would or should have known that the prisoner was at risk: the official must actually know of and disregard the risk to incur culpability." *Lewis v. Richards*, 107 F.3d 549, 553 (7th Cir. 1997) (citing *Farmer v. Brennan*, 511 U.S. 825, 837–38 (1994)). "[T]o show scienter by the deliberate-indifference route, a plaintiff must demonstrate that the public official knew of risks with sufficient specificity to allow an

6

inference that inaction is designed to produce or allow harm." *Vance v. Rumsfeld*, 701 F.3d 193, 204 (7th Cir. 2012). While this requires a showing of more than "mere or gross negligence" it is "less than the purposeful or knowing infliction of harm." *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006) (quoting *Matox ex rel. Matos v. O'Sullivan*, 335 F.3d 553, 557 (7th Cir. 2003)). "A defendant with knowledge of a risk need not 'take perfect action or even reasonable action[,] . . . his action must be reckless before § 1983 liability can be found.'" *Id.* (quoting *Cavalieri v. Shepard*, 321 F.3d 616, 622 (7th Cir. 2003)).

Bowens relies heavily on *Petties v. Carter*, 836 F.3d 722 (7th Cir. 2016), and argues his facts are "parallel" to that case. *See* Dkt. No. 53 at 13. Bowens' case significantly differs from *Petties* in at least two ways, however. First, Bowens did not suffer a ruptured Achilles tendon with, at one point, a gap of 4.7 cm between the torn ends of the tendon as did the plaintiff in *Petties*. *Petties*, 836 F.3d at 727. Neither party disputes that Bowens' MRI results showed he had a severe partial tear. Dkt. No. 54 at 8. In contrast, Petties initially suffered a complete Achilles rupture. Petties is described as having a partial tear after he started to recover, about 9 months after he was injured in January 2012. *Petties*, 836 F.3d at 727 ("That September, Petties had his second MRI, which showed a partial tear in his tendon, indicating some healing.").

The second way in which this case differs from *Petties* is that the plaintiff in that case experienced a delay of nearly six months before seeing an ankle specialist, and, in the interim, complained to medical services that his tendon was "killing him." *Id.* at 726. Petties also did not receive an MRI until March 2012, more than two months after he was injured. *Id.* Again, Bowens' facts are not similar. He does not dispute that: his self-reported pain level dropped by half by the time of his first follow-up appointment with HSU four days after he was injured ("a four or five out of a ten-point scale"); he received an MRI on October 2, 2013 (less than one week after his

7

injury); he received approval to see an orthopedic specialist on October 9, 2013, and was seen by APNP Anderson, who worked with Dr. Grossman, on October 22, 2013, and was seen by Dr. Grossman for a follow-up on November 7, 2013. Dkt. No. 54 at 7–12. With these facts in mind, the court turns to the individual allegations against each Defendant.

### A. Nurse DeYoung

Nurse DeYoung treated Bowens one time, the day he was injured. She saw that Bowens suffered an ankle/foot injury that altered his mobility and comfort. Nurse DeYoung put Bowens on a no-work restriction, prescribed Tylenol and Ibuprofen, and provided him with an Ace bandage and crutches. Bowens does not dispute that he was provided this treatment by Nurse DeYoung. He argues, however, that Nurse DeYoung recognized Bowens tore his Achilles tendon and his disabling pain level but failed to provide him the additional treatment that this required.

Yet, for a jury to find that Nurse DeYoung was deliberately indifferent, Bowens must do more than disagree with the course of treatment she provided. Nurse DeYoung made a professional judgment that his ankle injury would be better assessed once swelling had receded. *See* Dkt. No. 54 at 5 ("DeYoung would not have had Bowens . . . evaluated by a doctor or scheduled an x-ray . . . because she felt confident in the care she provided and injuries such as Bowens [sic] are best evaluated at a later time when swelling has gone down."). She applied an Ace bandage to Bowens, which she believed provided some immobilization. Dkt. No. 43 at 10.

While Bowens disagrees with this judgment, Bowens has not shown this it was unreasonable. He faults her for not immediately immobilizing his injury, a treatment not even endorsed by his own medical expert in all circumstances. When asked if immobilization is "essential" for an Achilles tendon tear to heal, Dr. Grossman, stated that it "depends on how you are going to treat it . . . if you are going to operate on it, it doesn't really make that much difference.

8

If you are going to treat it closed, it's the generally accepted way of doing this back at this time in 2013 . . . ." Dkt. No. 44 at 6. But Dr. Grossman suggests this treatment decision—to immobilize with a cast or an orthopedic boot, for example, or treat the injury surgically—would be made later, by a specialist like himself. *Id*. ("I would typically tell the emergency room doctor to put them in a splint and have them come and see me as soon as practicable and we could talk about what options they wanted to pursue."). In her role and at this initial point of triage, Nurse DeYoung would not be deciding if surgery was warranted or making an orthopedic assessment for further treatment. Though Nurse DeYoung did not apply a splint, this does not mean her care was deliberately indifferent. Dr. Grossman only suggests a splint would be "typical;" this does not imply that providing only an Ace bandage and crutches in order to reduce swelling so that an injury could be further assessed was reckless. And if immobilization is not even essential in all cases, it cannot follow that the level of care that Nurse DeYoung did provide rises to deliberate indifference.

In addition, Bowens makes much of Nurse DeYoung's alleged deviation from Waupun's "Musculoskeletal Pain Nursing Protocol." But this protocol does not mandate a preferred treatment method for an Achilles injury. It is a general outline and reads, in pertinent part: "Advise patient on PRICE measures . . . Compression (immobilization of affected part with splint, ace wrap, etc.)." Dkt. No. 55-2 at 3. The three-page protocol is not a comprehensive textbook; no nurse could rely on it to treat patients without their own knowledge and skill. And all the text Bowens relies on suggests is that a nurse must advise a patient to compress or immobilize the injury. It details no steps that would instruct a nurse on how to compress or immobilize an injury. Nurse DeYoung's interpretation that crutches and an Ace wrap appropriately treated Bowens' injury at this initial point of triage was not an unreasonable judgment. Without other evidence or a more elaborate protocol, this is not a deviation that constitutes deliberate indifference.

9

Bowens also argues that Nurse DeYoung was obligated to refer him to a physician on the day he was injured due to his disabling pain based on this protocol. The protocol recommends same-day, non-emergent referral for "disabling pain." Dkt. No. 55-2 at 3. Bowens has not brought evidence, however, to show that Nurse DeYoung was deliberately indifferent to his pain or that she was unable to make her own judgment about whether his pain was in fact disabling. While claiming his pain was disabling at the time of the injury, he does not assert that after Nurse DeYoung's treatment he was unable to depart without third-party assistance. Nurse DeYoung specifically advised Bowens, when scheduling his follow-up appointment, that he should submit a medical request form if his condition did not improve, a fact Bowens does not dispute. Dkt. No. 54 at 5. It does not appear that Bowens formally complained of any pain in the interim before his scheduled follow-up or sought an earlier appointment. And, at his subsequent appointment, Bowens does not dispute that he reported the intensity of his pain to be at four or five on a ten-point scale. As both Dr. Grossman and APNP Anderson suggested, there is typically some passage of time from when a patient is first treated for an injury like Bowens' and when they would be seen by them in order to further evaluate the injury. *See* Dkt. No. 44 at 6; Dkt. No. 42 at 5. It follows that Nurse DeYoung's decision to schedule follow-up care so his condition could be evaluated further at a time when swelling receded was not deliberately indifferent or reckless. Without more, a reasonable jury could not infer that Nurse DeYoung was deliberately indifferent to disabling pain. What Bowens actually disputes is Nurse DeYoung's professional medical judgment and the efficacy and appropriateness of the treatment he received—raising allegations of medical malpractice, but not deliberate indifference. Based on the undisputed facts before the court, a reasonable jury could not find Nurse DeYoung was deliberately indifferent.

### B. Nurse Messerole

Bowens also saw Nurse Messerole only once, on September 30, 2013, for a follow-up appointment scheduled by Nurse DeYoung. Bowens claims Nurse Messerole was deliberately indifferent because she did not immobilize his foot and ankle. The parties agree that Bowens reported his pain to be a 4 or 5 out of 10 and that Nurse Messerole assessed Bowens for signs of injury and found his motion limited, swelling and edema on his right ankle, that he was unable to bear weight, and that he lacked plantar or dorsi flexion. Dkt. No. 54 at 7. Nor does Bowens dispute that Nurse Messerole requested a physician consult (though Bowens contends, however, that he was not seen by a physician on this particular day). *Id.*

Bowens has failed to show Nurse Messerole was deliberately indifferent. She assessed Bowens' injury and determined that further care was necessary from a physician. As a nurse, she does not render a diagnosis, and her treatment of Bowens ended when she referred care to Dr. Manlove. Absent further instruction, a jury would reasonably conclude that Dr. Manlove was responsible for Bowens' treatment at this point.

Despite agreeing that Nurse Messerole made the physician referral, Bowens questions whether he saw Dr. Manlove on the same day. He does not successfully attack the medical records that prove otherwise, however. Dkt. No. 40-1 at 7. These records show that Dr. Manlove saw Bowens and ordered an MRI on the same day he was treated by Nurse Messerole. *Id.* Even if it was a day or two later, however, the difference is not material.

Bowens makes no claim that he saw Nurse Messerole again after she requested a physician consult, nor does he allege any facts that pertain to her after she processed this request. This leaves nothing that appears unreasonable or rises to deliberate indifference. Nurse Messerole exercised her professional judgment and contacted a physician. She was not involved in Bowens' care after

11

this point. She had every reason to assume that any further care would be in the hands of the referring physician, absent instruction to the contrary. And no such evidence has been provided. As such, Bowens' claim against Nurse Messerole fails.

### C. Dr. Manlove

Bowens argues that Dr. Manlove failed to immobilize his ankle and to timely refer him to an orthopedic specialist. While Bowens contends Dr. Manlove acted with a lack of urgency, his argument fails in light of the facts and the medical record. He does not show that the alleged delay amounts to deliberate indifference.

Bowens disputes that Dr. Manlove ordered his MRI after he saw Bowens on September 30, 2013. Dkt. No. 54 at 7. As noted, this is contradicted by the medical records and Nurse Messerole's account. Still, Bowens claims that he did not see Dr. Manlove until after his MRI on October 2, 2013, and states that he reviewed his MRI with Dr. Manlove on October 10, 2013. PPFF, ¶¶ 42–43. At the same time, Bowens does not dispute the fact that at some point Dr. Manlove ordered an MRI for Bowens as a Class II Authorization (which did not require prior approval) specifically in order to expedite the results. Dkt. No. 54 at 8. His dispute with the medical records adds little to the allegation that Dr. Manlove was deliberately indifferent, however. If, as Bowens claims, Dr. Manlove did not personally treat Bowens until later, it suggests that he played an even smaller role in the alleged delay than Bowens claims.

Bowens also argues that Dr. Manlove failed to immobilize his injury, again pointing to Waupun's nursing protocol. As discussed with respect to Nurse DeYoung, the nursing protocol is not a comprehensive treatise that would override the reasonable professional judgment of a physician. And, as Dr. Grossman stated, whether the injury is immobilized "depends on how you are going to treat it." Dkt. No. 44 at 6. If Bowens' own medical expert does not suggest

12

immobilization is essential for every case, the court cannot hold Dr. Manlove to a different standard. When Dr. Manlove first treated Bowens in person on September 30, he had not yet seen the MRI results, and once he did, he requested that Bowens see an offsite orthopedic specialist for further evaluation. Without more, this does not show such a substantial departure from accepted medical judgment that deliberate indifference could be inferred.

In any event, Bowens has not offered any evidence that a delay of 12 days before he was seen by APNP Anderson on October 22, 2013, constitutes deliberate indifference on the part of Dr. Manlove (who, in Bowens' account, did not see him in person until October 10). "[D]elays are common in the prison setting with limited resources, and whether the length of a delay is tolerable depends on the seriousness of the condition and the ease of providing treatment." *Petties*, 836 F.3d at 730. In fact, delays in obtaining medical care are not uncommon outside of prison. According to the Seventh Circuit, "[t]o show that a delay in providing treatment is actionable under the Eighth Amendment, a plaintiff must also provide *independent evidence* that the delay exacerbated the injury or unnecessarily prolonged pain." *Id.* at 730–31 (emphasis added). Bowens has not done that here. Bowens' own medical expert in this lawsuit, Dr. Grossman, was also one of his treatment providers and examined Bowens on November 7, 2013. Dr. Grossman's written statement following the November 7 appointment states that

> Mr. Bowens is seen in followup. . . . He has been in an Achilles boot, weightbearing as tolerated. He reports no particular pain. . . . There is no particular tenderness to palpation along the Achilles tendon. Squeezing his calf shows some plantar motion of the foot. IMPRESSION: Achilles tendon tear, doing well with nonoperative treatment. He should be in the Achilles boot for 6 weeks total (6 weeks from 10/22 is approximately 12/02). . . . I have not scheduled any specific followup.

Dkt. No. 40-1 at 21. Dr. Grossman's account casts significant doubt on any independent evidence Bowens could bring to show a delay prolonged or exacerbated his injury. Any lasting negative impact of Defendants' care was not evident to Dr. Grossman, just over a month after Bowens was

13

injured and less than three weeks after he was seen by Dr. Grossman's colleague, APNP Anderson. Whatever impact Defendants' treatment had on him, Dr. Grossman was still able to conclude that Bowens was "doing well with nonoperative treatment." Bowens brings no evidence to challenge this assessment. Instead, he offers Dr. Grossman as his medical expert. And Bowens does not allege that Dr. Manlove or the other defendants were involved in his treatment after 2013. Without additional facts, no reasonable jury would find that Dr. Manlove's treatment, or any of Defendants, directly caused the pain Bowens claims to suffer years later. In sum, Bowens has failed to show Dr. Manlove was deliberately indifferent.

**D. Belinda Schrubbe**

Bowens argues that Health Services Manager Schrubbe was deliberately indifferent in her personal capacity because she failed to address his injury and deviated from internal protocol. In her role, Schrubbe oversaw the nursing staff at Waupun, but did not personally treat Bowens. Bowens wrote a letter to Schrubbe on October 29, 2013, where he requested a second opinion and accused HSU of forgetting to schedule an appointment with an orthopedic doctor.

Again, Bowens does not support these claims with the evidence necessary to survive summary judgment. Schrubbe responded to Bowens' letter on November 5, 2013, stating: "You were seen by a specialist. The D.O.C. [Department of Corrections] does not provide second opinions. Follow Dr. Grossman's plan of care." Dkt. No. 40-1 at 43. While Bowens had not yet seen Dr. Grossman, he had seen APNP Anderson on October 22, 2013, who worked with Dr. Grossman and was to collaborate with him on a plan of care for Bowens. *Id.* at 19. APNP Anderson prescribed a walking boot and recommended a follow-up appointment with Dr. Grossman in two to three weeks. Dkt. No. 54 at 11. These allegations do not support a claim of deliberate indifference with respect to Schrubbe. APNP Anderson, who worked with Bowens'

own medical expert, set the timetable for Bowens to have a follow-up with Dr. Grossman in two to three weeks from his October 22, 2013. Even if HSU had yet to schedule the appointment when Bowens wrote his letter to Schrubbe, Bowens saw Dr. Grossman within the time period suggested by APNP Anderson. No reasonable jury would find Schrubbe deliberately indifferent on these facts.

### E. State Law Claims and Nurse Larson

Having dismissed each of Bowens' federal claims, the court must consider whether to exercise supplemental jurisdiction over his remaining state law medical practice claims. *See* 28 U.S.C. § 1367. After dismissing each claim over which it has original jurisdiction, the court recognizes it may decline to exercise supplemental jurisdiction over any pendent state law claim. 28 U.S.C. § 1367(c)(3). There are specific situations where a district court should not relinquish jurisdiction, including when "(1) the state law claims may not be re-filed because a statute of limitations has expired, (2) substantial judicial resources have been expended on the state claims, or (3) it is clearly apparent how the state claims are to be decided." *Dargis v. Sheahan*, 526 F.3d 981, 990 (7th Cir. 2008) (citing *Williams v. Rodriguez,* 509 F.3d 392, 404 (7th Cir. 2007)). Taking these matters into consideration, the court will exercise its supplemental jurisdiction to dismiss Bowens' state law medical malpractice claims.

As the court noted in its screening order, it appeared that any state law negligence or medical malpractice claims were barred by the three-year applicable statutes of limitation. *See* Wis. Stat. §§ 893.54 and 893.55(1m). Defendants argue that Bowens did not file his complaint until nearly 10 months after the three-year deadline passed. Bowens has failed to even respond to Defendants' argument that his state law medical malpractice claims are barred. Dkt. No. 37 at 20. "Failure to respond to an argument generally results in waiver . . . ." *Ennin v. CNH Indus. Am.,*

15

*LLC*, 878 F.3d 590, 595 (7th Cir. 2017). Regardless of Bowens' failure to challenge Defendants' argument on his state law claims, the court agrees that the statute of limitations bars his claims. Over three years passed between the date of the alleged injury, September 26, 2013, and the date Bowens' complaint was filed before this court, August 14, 2017. His state law claims are therefore time-barred.

Finally, at screening, the court allowed Bowens to proceed on his claims against Nurse Ann Larson. Dkt. No. 7. The Wisconsin Department of Justice was not able to identify and serve a defendant under that name. The record shows that Plaintiff had until March 29, 2018, to use discovery and identify the correct name for this individual. Dkt. No. 12. Plaintiff did not do so and his proposed findings of fact and brief in opposition to Defendants' motion for summary judgment fail to allege any facts with respect to this individual. His claim against this defendant is dismissed for this reason as well.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. No. 36) is **GRANTED**. This action is **DISMISSED**, and the Clerk is directed to enter judgment for Defendants. The court also wishes to express its appreciation to Attorneys Shorts, Eisenberg, and Kluender, and the Previant Law Firm, S.C., for the assistance they provided pro bono to Mr. Bowens.

**SO ORDERED** at Green Bay, Wisconsin this 13th day of July, 2020.

s/ William C. Griesbach
William C. Griesbach
United States District Judge